# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

September 18, 2020

Gregory A. Belzley
Camille A. Bathurst
Belzley, Bathurst & Bentley
P.O. Box 278
Prospect, Kentucky 40059

***Regarding: Cynthia Heffner Roberts, Administratrix of the Estate of Christopher Allen Roberts, Deceased, and next Friend of A.A.R., Mr. Roberts', Minor Daughter, v. Manuel Cruz, et al., Case No.: 3:19-cv-00186-RGJ.***

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the July 19, 2018 **L**aw **E**nforcement **A**ctivity **R**elated **D**eath (LEARD) of Mr. Christopher Allen Roberts (Mr. Roberts) by Jeffersontown Police Department (JPD) Officer Manuel Cruz (Officer Cruz). Pursuant to the requirements of Rule 26, I have studied the JPD reports, deposition transcripts, video recordings, audio recordings, autopsy report, photographs, and other material (as listed below) provided to me regarding this case. Please be advised that if/when any additional information is provided, it is probable that a supplementary report will be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions. That is, where there are differences in the events proffered by Officer Cruz, and/or witnesses, versus the statements proffered by other witnesses, I do not opine for the trier of fact regarding who are the more believable witnesses. I consider that the resolution of any such conflict is delegated to, and is within, the purview of a jury to determine.

**<u>Materials Reviewed Thus Far:</u>**

1. Plaintiff's Complaint for Damages.

2. KYBIRS Report, Commonwealth of Kentucky, Incident Number: 170780031 Agency ORI: 0561000 Badge #: 8286, Pages 1-11.

3. Supplementary Report A.F.I.S Section Forensic Latent Print Laboratory, Kentucky State Police, Case No.: 18-170780031, A.F.I.S ID. 18-17-1026.

4. Case 170780031 Summary, 12/13/2018.

5. Jeffersontown Police Department Administrative Incident Report, JT-118.

6. Justice and Public Safety Cabinet Office of the Chief Medical Examiner, Final Diagnosis, Pages 1-9, Greg Balko, M.D. Neuropathologist.

7. Event Chronology, Event Number: 1018010031.

8. Jeffersontown Policy Manual, Pages 1-182 (SOP).

9. Death Investigation of Christopher A. Roberts Involving Officer Manuel Cruz (8289) CID Case File # 18-170780031, January 3, 2019.

10. Jeffersontown Fire and EMS, Patient Care Record, Roberts, Chris, Incident #: E18068597 Date: July 19, 2018.

11. Commonwealth VS. Roberts, Christopher A., Jefferson Circuit Court, 17-CR-003605, December 7, 2017.

12. Kentucky State Police, Request for Evidence Examination, July 19, 2018, Case No.: 18-170780031.

13. Jeffersontown Police Department, Case File Report, Property Report, 19, 2018, Case No.: 18-170780031.

14. Clinical Forensic Medical Consultation LF-18-33, August 1, 2018.

15. Commonwealth of Kentucky, Court of Justice, Affidavit for Search Warrant, July 19, 2018.

16. Officer Cruz Radio Transmission.

17. CAD Event Search.

18. Property Release to Family Report.

19. Video Recordings:
    a. Scene Walk-Through Video.
    b. Marathon Gas Video.
    c. Hotel Surveillance Video.

20. Deposition Transcripts:
    a. Officer Manuel Cruz (Defendant), July 27, 2020.

21. Photographs:
    a. Taser Probe Photos.
    b. CID Photos.
    c. Christopher Roberts Identification Attempt.
    d. 327 Photos, IMG_0001-IMG_0008.
    e. 313 Photos, IMG_0027-IMG_0048.
    f. 381 Photos, 4540(1), 4540(2), 4540(3), 4540(4), 4540 route; IMG_0364-IMG_0374 and IMG_0610-IMG_0614.
    g. Hospital Photographs, DSC_9225-DSC_9330.

22. Medical Records / Medical Examiner Reports:
    a. Chain of Custody Blood ME.
    b. ME Final Report Toxicology.
    c. ME Postmortem Final Report.
    d. Post Mortem - Autopsy, Christopher Roberts.
    e. University Hospital Medical Records, 1-3.

23. Witness Interviews:
    a. Witness Antonio Jewell, January 19, 2019.
    b. Officer Manuel Cruz, July 25, 2018.
    c. Officer Andrew Eichberger, July 23, 2018.
    d. Jeffersontown Fire/EMS Jamie Marchigeon, July 25, 2018.
    e. EMS/Paramedic Billy Girard, July 25, 2018.

f. Officer Daniel Goldberg, July 23, 2018.
g. Officer Payton Henderson, July 25, 2018.
h. Witness Jacob Pinette, July 19, 2018.
I. Officer Michael Jacobs, July 24, 2018.
j. Witness Ryan Sicher, July 24, 2018.
k. Transcript of Phone Message left by Antonio Jewell.
l. Witness Jacob Pinette, July 24, 2018.
m. Corey (Hotel Employee), July 20, 2018.

24. Witness Interview Transcripts:
a. Witness Antonio Jewell, January 19, 2019.
b. Officer Manuel Cruz, July 25, 2018.
c. Officer Andrew Eichberger, July 23, 2018.
d. Jeffersontown Fire/EMS Jamie Marchigeon, July 25, 2018.
e. EMS/Paramedic Billy Girard, July 25, 2018.
f. Officer Daniel Goldberg, July 23, 2018.
g. Officer Payton Henderson, July 25, 2018.
h. Witness Jacob Pinette, July 19, 2018.
I. Officer Michael Jacobs, July 24, 2018.
j. Witness Ryan Sicher, July 24, 2018.
k. Transcript of Phone Message left by Antonio Jewell.
l. Witness Jacob Pinette, July 24, 2018.

25. Officer Interviews:
a. Officer Andrew Eichberger, July 23, 2018.
b. Officer Michael Jacobs, July 24, 2018.
c. Officer Daniel Goldberg, July 24, 2018.

26. *2011 Electronic Control Weapon Guidelines*. U.S. Department of Justice
Office of Community Oriented Policing Services and Police Executive
Research Forum (PERF), Washington, D.C., March, 2011.
27. Taser International Training Materials and Product Warnings.

28. Internet-based Images of the Scene.

**Brief Overview of Events and Commentary:**

In July of 2018, Mr. Roberts was on house-arrest and wore a court-ordered anklet GPS tracking device. Mr. Roberts was known to reside at 116 Trammel Lane, Bagdad, Kentucky. For reasons only known to Mr. Roberts, on June 28, 2018, he removed the anklet tracking device and took residence at the Home Towne Studios Hotel - 4540 Taylorsville Road in Jeffersontown, Kentucky with his girlfriend, Ms. Cheyenne Stirling.

Mr. Roberts had been released on his own recognizance on a pending case for a fourth DUI driving offense dated December 6, 2017, which was scheduled to be adjudicated on August 7, 2018. Mr. Roberts had removed an anklet monitor and fled the court-ordered home incarceration and had an outstanding warrant for his arrest. Accordingly, Mr. Roberts' warrant was not due to any violent or aggressive attacks toward law enforcement, his family or any other person, or for theft/burglary or any other major offense.

On July 18, 2018, witnesses allegedly observed Mr. Roberts walking at the hotel while carrying a sheathed knife. Nonetheless it is admitted in the record per the criminal code that it is not illegal to carry a sheathed knife in Jeffersontown (see 527.020) and none of the witnesses reported ever being threatened by Mr. Roberts or ever observing Mr. Roberts threaten anyone else. Officer Cruz has testified that he was aware of this statute when he encountered Mr. Roberts.

> Q. Oh, okay. Okay. I understand. Is it illegal to carry a knife?
> A. No, sir.
> Q. Okay. So what Mr. Pinette described to you may have been concerning, but it wasn't illegal?
> A. No, sir. (Cruz, Page 47)

Additionally, it is uncontested in the record that Officer Cruz was totally ignorant of Mr. Roberts outstanding warrant for his arrest for his failure to abide by his court-ordered GPS home detention. In fact, Officer Cruz did not even know Mr. Roberts' name.  However, Officer Cruz did know that Mr. Roberts was merely on the premises (perhaps as a guest) and there were no reports whatsoever that he had threatened or assaulted anyone and that no one at the location had called JPD - 911 dispatching him (Cruz) to the scene alleging any injury, threat or assault.

The hotel structure stands three stories tall, and has two main towers. One tower spans north to south and the other tower spans east to west. The north end of the north and south tower intersects with the south wall of the east and west tower in the middle of the east and west tower, creating (from an aerial view) a capital "T". The tower that spans from east to west has two stairwells, which can be accessed from the north and south sides of the tower. This

tower also has an elevator in the middle of the tower, which can be accessed from the north face of the east/west tower. The tower that spans from north to south (the longer tower) has one stairwell that is situated at the south end of the tower.  This stairwell can be accessed from the east and west side. The hotel is surrounded by a parking lot.

There are several businesses near the hotel. Approximately 150 feet east of the hotel is a small car wash and a Marathon gas station and convenience store. A walk east on Salesman Drive, from the hotel, would take about two minutes or less.

On July 19, 2018, at 10:18:07 a.m., Mr. Roberts was video recorded at the hotel and captured him entering a small hotel laundry room. Mr. Roberts exited the hotel laundry room approximately 25 seconds later.

25 minutes later at 10:44:46 a.m., Mr. Roberts entered the Marathon Gas convenience store. Mr. Roberts remained in the convenience store until 10:46:22 a.m. He purchased a large plastic container of laundry detergent and held two cell phones and talked on them both throughout his visit at the convenience store.

Based on surveillance video at the hotel and convenience store, Mr. Roberts was not in possession (not carrying) a knife. Video did not capture any bulges from his sides or back. While at the hotel, his hands were free of any knife and he did not have a shirt on and no knife appeared to be lodged in his under garments or shorts.

After leaving the Marathon Gas convenience store, Mr. Roberts made his way back to the hotel. At this point in the sequence of events, Officer Cruz was driving through the hotel parking lot, running various license plates to determine whether the tags were expired.  As Officer Cruz drove through the parking lot, Mr. Jacob Pinette flagged him down and reported that he had seen a male (allegedly Mr. Roberts), who wore a white t-shirt and red shorts, walking in the area with a "large" knife. Mr. Pinette did not report that he was assaulted or threatened by the person carrying the knife.

Officer Cruz was a solo unit and did not call for a back-up officer to join him. He alighted his patrol car and began to walk around the hotel on foot looking for the reported male with a knife. As Officer Cruz walked around the hotel, he neared room 123. As he neared room 123, he happened upon Mr. Roberts in the hallway. According to Officer Cruz, Mr. Roberts carried the same large blue container of laundry detergent in his left hand and a knife in his right hand. Officer Cruz testified that he was not certain whether the knife was sheathed or unsheathed.

According to Officer Cruz, Mr. Roberts "pointed" the knife at Officer Cruz. Whereupon Officer Cruz immediately drew his firearm and pointed it at Mr. Roberts. As stated above,

Officer Cruz has testified that he did not know whether the knife was sheathed but never indicated that Mr. Roberts aggressed towards him.

> Q. So it's your testimony you're standing four feet away from a person that points a knife at you, and you don't see that it's in a sheath?
> A. No, sir. This happened very quick. As we come in contact with each other, I scanned his body for weapons or things that are going to create harm to me or somebody else, and I saw what appeared to be, at the time, a black buck knife. (Cruz, page 56)

During his testimony, Officer Cruz was asked why he did not immediately fire his service weapon, as he had claimed he feared for his life. Officer Cruz answered that Mr. Roberts ran off so quickly that Officer Cruz didn't have time to react.

> Q. Why didn't you discharge your service weapon at that point?
> A. Because he took off running. (Cruz, page 57)

Officer Cruz has also testified when asked, that Mr. Roberts never assaulted, or attempted to assault, him.

> Q. Okay. Now, did Mr. Roberts ever try to throw a punch at you?
> A. No, sir.
> Q. Did he ever try to kick you?
> A. No, sir.
> Q. Did he ever pick up anything and throw it at you?
> A. No, sir.
> Q. Prior to your tasing him, did you have any physical contact with Mr.
>      Roberts?
> A. As actually, like, touching him --
> Q. Yes.
> A. -- or him touching me?
> Q. Yeah.
> A. No. (Cruz, Pages 76-77)

At this point in the sequence of events, Mr. Roberts apparently simply quickly turned, and ran away from Officer Cruz. A foot pursuit in the hallway ensued with Officer Cruz chasing after Mr. Roberts. Mr. Roberts ran from the south side of the east/west tower, onto the stairwell, entered the second floor, and ran from west to east. Officer Cruz testified that he holstered his service weapon as he gave chase.

After entering the second floor, Mr. Roberts turned left and ran east, then turned right, and entered the north/south tower. Mr. Roberts ran along the west side of the north/south tower.

Page 7 of 30

According to Officer Cruz, Mr. Roberts attempted to enter several suites but was not successful.

At this point in the sequence of events, Officer Cruz testified that he had drawn his taser and pointed it at Mr. Roberts. Mr. Roberts stopped briefly at the stairway and faced Officer Cruz. Officer Cruz testified that he gave three commands, then he fired his taser at Mr. Roberts.

According to Officer Cruz, Mr. Roberts was still holding the large laundry detergent container in his left hand and the knife with his right hand. When he fired his taser he missed Mr. Roberts - one taser barb punctured the plastic laundry container and the other struck the wall - neither barb made contact with Mr. Roberts. However, Mr. Roberts reacted and uttered an "oh!" then turned away and ran south, then turned left and entered the north/south tower stairwell with Officer Cruz behind him.

Mr. Roberts ran down the stairs. During that time Officer Cruz took aim and fired another set of taser barbs at Mr. Roberts. Based on the internal taser report, the second round of barbs was fired within just three seconds of the first (when Mr. Roberts was standing on the second floor and near the top of the stairway).

Officer Cruz has testified that he waited to fire the second taser barbs at Mr. Roberts until Mr. Roberts was at the bottom of the stairwell. However, given the distance from the reported first deployment of the taser (near room 233) to the second deployment of the taser (near the top of the stairwell) which occurred just three seconds later, it appears that Officer Cruz fired the second round of taser barbs while Mr. Roberts was at the top or descending the stairwell - a specific violation of policy and training.
After being struck in the back by the taser darts, Mr. Roberts "locked up" and fell down the stairs, striking his head on the concrete at the bottom of the stairway, and suffered catastrophic (and ultimately fatal) injuries.

It cannot be overstated that Officer Cruz's knowledge that a back-up unit was within seconds of arriving should have caused him to adjust his approach to the fleeing suspect (Mr. Roberts).

Officer Cruz had not observed any crime other than when he engaged Mr. Roberts, drew his handgun and then ordered Mr. Roberts to drop the knife, at which point, Mr. Roberts simply ran away. And despite knowing that backup by that time was at the hotel, Officer

Cruz fired his taser at Mr. Roberts prompting a second attempt to flee. At the time Officer Cruz deployed his Taser at Mr. Roberts - who was running away – Mr. Roberts was not wanted for a violent felony and demonstrated no risk of serious bodily harm or death to Officer Cruz or anyone else. In fact, the only crime Mr. Roberts had committed, according to Officer Cruz's knowledge, was failing to comply with Officer Cruz' order to stop running away and drop the knife.

Page 8 of 30

Furthermore, Officer Cruz himself had not been assaulted or threatened, and was not aware of any reports that Mr. Roberts had assaulted anyone else. Accordingly, no exigency existed. Mr. Roberts, at worst, was simply attempting to evade Officer Cruz.

> Q. Had Mr. Roberts -- did Mr. Pinette tell you that Mr. Roberts had
>      threatened him?
> A. No.
> Q. Did you hear Mr. Roberts make any threats against Mr. Pinette?
> A. No. (Cruz page 39)
>
> Q. Okay. Back to Mr. Jewell, did you hear Mr. Roberts threaten Mr.
>      Jewell?
> A. No, sir.
> Q. Did Mr. Pinette tell you that Mr. Roberts had threatened Mr. Jewell?
> A. No, sir. (Cruz, page 42)

Training and policy dictates that a Taser should not be deployed when a subject is on stairs or on an elevated level, because the inevitable fall that would result (as occurred in this case) in serious injury or death. After Mr. Roberts fell and struck his head, he lay motionless. Officer Cruz testified that he hurried down the stairwell, and instead of securing Mr. Roberts' hands, he picked the knife up and put it in his belt. Then he eventually removed it after some time and placed it on the ridge of a nearby buttress.

> Q. Now, when you picked -- when did you realize the knife was in a sheath?
> A. When I got to the bottom of the steps, sir, I -- when I reached down to
> pick it up, I noticed it was in a sheath that was unbuckled, and the knife was
> about halfway out of the sheath.
> Q. Okay. Do you know whether the knife was halfway out of the sheath before Mr.
> Roberts hit the ground?
> A. I don't know, sir. (Cruz, Page 77)
>
> Q. Did anybody -- and I think I know the answer to this question, but I just need to ask
> this to be clear. Nobody -- are you aware of anybody photographing where the knife
> was in relation to Mr. Roberts' body?
> A. No, sir.
> Q. Or measuring the distance it was from his right hand?
> A. No, sir.
> Q. Did anybody, before today, ask you where the knife was in relation to
> Mr. Roberts' body or his right hand? ...
> Q. Okay. Well, let me -- let me -- let me re-ask the question and make -- ask
> a better question. Other than what you may have been asked by your
> counsel, prior to me asking you today, has anyone asked you where the knife
> was in relation to Mr. Roberts' body or his right hand?

A. I think the investigators asked me something similar to that. I don't know
if it was those exact words, where the knife was. And I told them I secured
it, but I don't know if they asked me exactly where the knife was or not.
(Cruz, Pages 77-78)

At this point in the sequence of events, Officers Eichberger, Goldberg, Jacobs and
Henderson arrived on scene. Officer Henderson arrived first and reported that Officer
Cruz still had his taser in his right hand. According to Officer Henderson, the sheathed
knife was already propped on the shelf of the buttress - contrary to Officer Cruz's
statement that he carried the knife for a while, before he placed it on the shelf of the
buttress.

When Officer Cruz handled and moved the knife, the only evidence of the knife's resting
position was from Officer Cruz's narrative. There was no reason in the record for Officer
Cruz to move the knife from its position and put it in his belt and then place it on the shelf of
a nearby buttress. At most, if he was afraid that Mr. Roberts could somehow recover and get
the knife, Officer Cruz should have used his foot to move the knife several feet away from
Mr. Roberts.

What must not be lost in this incident is the fact that no video of Mr. Roberts, taken
minutes before or during his encounter with Officer Cruz, ever depicted him with a
knife in his hands or on his person.

Paramedics eventually arrived and transported Mr. Roberts to University Hospital. He
succumbed to his injuries on July 20, 2018. Mr. Roberts is survived by his family and
daughter.


**Officer Cruz Statement Excerpt:**

"On July 25, 2018 at 1020 hrs, Det. Graas and Sgt. M. Timperman met with
Officer Manney Cruz and Steve Schroering at Jeffersontown PD conference
room. At this time Ofc. Cruz provided his statement to Sgt. M. Timperman
and Det. Graas. In summary, Ofc. Cruz advised that he was driving through
the parking lot of the Hometown Studios checking for registered tags in
violation. Ofc. Cruz reports driving around the lot and being flagged down by
a w/m on the grass, walking his dog, in the area between the Hometown
Studios and the car wash business. Ofc. Cruz advised that the subject told him
there was a man walking around with a knife and provided an area of the hotel
that he was walking. Ofc. Cruz reported that he pulled forward into a parking
space and got out on foot walking thru the breezeway and around the center /
front of the facility glancing into the laundry room, seeing a female folding
laundry but not the suspect. Ofc. Cruz reports that he approached the

complainant and asked for a more detailed description, white "t" shirt, red shorts and he believes he provided a description to radio.  Ofc. Cruz advised he walked back into the breezeway where he observed a W/M subject meeting the description provided by the complainant, standing near the stairwell. Ofc. Cruz began to address the subject when he observed a black knife near his waist level, but in his hands, at which time the subject was described as attempting to tuck the knife under / behind his arm to conceal it. Ofc. Cruz advised he drew his service weapon and gave verbal commands to drop the knife more than once. Ofc. Cruz advised the subject proceeded to flee on foot up the stairs, with the knife in his hand. Ofc. Cruz stated that he stumbled on the first step and lost sight of the individual by the time he continued up the stairs. At the top of the stairs Ofc. Cruz reported looking to the left and not observing the subject he proceeded to the right. As Ofc. Cruz reports rounding the corner of the hall / balcony to the right he observed the w/m suspect at a door, appearing to be attempting to gain entry, hand on the handle, etc, and Ofc. Cruz having re holstered his service weapon, drew his Taser. Ofc. Cruz reports giving verbal commands, as described by witnesses, but the suspect turned toward Ofc. Cruz, squaring up on him, at which time Ofc. Cruz observed the black knife in the subject's right hand and a blue detergent container in the subject's left hand. Ofc. Cruz described the knife as a straight blade buck / skinning type knife. Ofc. Cruz reported deploying his Taser at this time, however the probs did not connect with the subject, one appeared to have hit the wall and one into the blue detergent bottle, and the subject, continuing to disregard the verbal commands of Ofc. Cruz, fled again around the corner to the breezeway heading for the stairwell down. Ofc. Cruz, recalled believing that there was danger of death or serious physical injury to the subject outside of the stairwell with the dog, as well as another subject on the opposite side of the stairwell breezeway Ofc. Cruz had seen previously.  Ofc. Cruz, noting that responding officers were approaching from the direction the subject was fleeing, armed with a knife and knowing the individuals discussed above, and unsure of their initial involvement with the suspect, deployed his taser, a 2nd time, as he believed the subject was on the landing of the 1st floor at the steps, and described as an estimate of 12 feet away, at which time both probs struck the subject causing him to lock up and fall to the ground striking his head upon the concrete sidewalk. Ofc. Cruz reported immediately reaching the subject and checking him for injuries, contacting EMS via dispatch, and securing the knife between his ASP, expandable baton and his back, at which time he noticed the knife was not solid black but was in a black sheath, unsnapped and immediately accessible, Ofc. Cruz snapped the secure strap and yelled out to Ofc. P. Henderson, who was approaching, so Ofc. Henderson could identify Ofc.. Cruz and the suspect's location. Ofc. Cruz advised, believing the suspect might possess more than one weapon as he secured the suspect's hands with handcuffs, Ofc. Henderson conducted a pat down search for weapons at the

same time Ofc. Jacobs arrived on scene. Ofc. Cruz advised Ofc. Jacobs retrieved his medical bag and Ofc. Cruz placed the suspect in the recovery position and controlled the head and neck of the suspect while Ofcs. Jacob and Henderson treated the subject and his head injury wrapping it. Ofc. Cruz advised that upon EMS arrival they took over care and assessment, transporting to University of Louisville Hospital Trauma Room 9. Ofc. Cruz advised that he walked to the office in order to attempt identification of the subject as they had a pay type card in the name of Chris Roberts, but they had no listing in that name, however the employee stated that he believed it was the same person who was out walking around the day previously with a knife in his hand, wandering as though aimlessly. Ofc. Cruz walked Ofc. Jacobs around the route taken by him and the subject for attempt to locate any property or witnesses. Ofc. Cruz was then photographed then accompanied by Ofc. Payton and transported home." (KYIBRS Report, Pages 7-8, Incident Number: 170780031)

**Excerpt from Officer Cruz Interview Transcripts, July 25, 2018:**

A: Um, it was on July 19th I was just out on regular patrol. And came to the hotel parking lot at 4540 Taylorsville Road. Um, as I was going around the parking lot, um, kind of went kind of clockwise when I came in. Um, went through the front of the building. And I started running some license plates to see if, uh, there was any license plates that have been recalled by the Department of Transportation. Um, I was making my way around when I got to about right here in this area. Um, there was a gentleman over here on this grass bank, uh, walking a dog and he flagged me down. Um, when he flagged me down, um, I stopped, rolled down my window.  And I was goin' pretty slow, probably like 2 miles an hour, as I was running license plates. He flagged me down. Um, he walked over to my car and I think he said, "Sir, there was a guy that just, uh, walked right over there and he had a big knife on him." So I pulled straight ahead, um, into a parking space. I don't even think I got my car all the way in the parking space. It was kind of half st- half stickin' out.  And, uh, I walked around. There's a little opening. Um, I pulled into one of these parking spaces over here. I got out, went through here. And on the first floor came out, went around here. Came back through and came back the same way. And I never saw anybody.  Um, as I was gettin' out the car I actually called out on the radio. I told them where I was. Told them that I had somebody flag me down. Uh, and that he was supposed to have a knife on him. 'Cause that - that's what that gentleman told me. I - I don't know his name. Q: Can I interrupt you for just a second?
A: Yes.

Q: While you're - while you're showing us with your pen could you go
ahead and just make a - make a mark where you think you parked your car?
And then actually just draw a line where you might... A: Okay.

Q: ...have walked by foot?

A: Um, I'm not sure which parking...

Q: Okay.

A: ...space I was. I think I parked like right here.

Q: Okay, sir.

A: And my car was kind of - it was facing front. Uh, there was kind of a little
        bit stickin' out.

Q: Yes, sir.

A: Um, I went to this opening over here.

Q: Yes, sir.

A: Um, there's a little opening with the stairwell. I came in, walked this way.
There's a little passage I think (unintelligible) to get down here. Q: Yes, sir.

A: Uh, I think there might - might be like a vending machine or somethin'
        like that. Uh, came through here. And walked this area again.
        Came back through and came back out.

Q: Okay, sir.

A: Um, when I came back out that gentleman was still around this area over
        here.

Q: The one that flagged you down initially?

A: Yes.

Q: Okay, sir.

A: ('Cause) I - I never got a description, uh, of what the other
        gentleman looked like.

Q: Okay.

Q1: Just for clarification, so you're parked on the - towards the back of the
        building which is the car wash side?

A: Yes.

Q1 Okay.

A: Yes.

Q1: And you kind of come through and go - there's like a - like you said a
        passageway.

A: Yes.

Q1: You come and go past the - the vending machines. You come out to the
front of the building. Did you come out to the front parking lot? A: Uh, I
don't know if I came all the way out here or if I came back this way.

Q1: Okay.

A: I'm not sure on that part.

Q1: Okay. But you eventually turned back around and... A:
Yes - yes.

Q1: ...kind of went back out where you came into.

A: Yes.

Q1: Okay.

A: I - I either came all the way out here or I came through here and then walked back this way.

Q1: Okay.

A: And, uh, there's like a laundry mat over here?

Q1: Right.

A: I looked in there, just kind of glanced in. There was a lady that was folding a sheet.

Q1: Okay.

A: Or a towel or somethin' like that. Um, kind of just gazed in there. I don't see anything, uh, besides her. And, uh, came back, uh, to where that gentleman was.

Q1: Okay.

A: When I came back I, um, uh, I went up to him. He - he had a - like a white dog with brown spot on it I think it was. Um, the dog came up to me. I petted the dog. I was like, "Hey, what did the guy look like? Was it white, black, Hispanic?" And he said, "He was a white guy. Had a, uh, white T shirt." And I think he said red shorts. I said, "Okay." And I went back that way again. Um, as I was walkin' in at some point, and I don't remember when, I got on the radio and I put the description on the radio of, uh, what he looked like. Uh, I got to about right here, I believe it is, um, where the stairs go up. And, um, I - I think I was actually still on the radio when, uh, we met. He was coming towards the stairs. I was coming back into the walkway of the building. And I started saying, "But let me - let me talk to you for a second." And I don't even know if I finished that sentence. And, uh, as I'm talking to him I start scanning his body. And I seen a - a knife, what appeared to be a black knife at the time in his hand.  Uh, when I saw that I think I kind of stepped back and put my left hand in front of me. Um, and I drew my gun. Um, and I told him to drop the knife. Drop the knife. Please, drop the knife. Um, he looked at me and I remember seeing - I mean, his eyes were huge. And, uh, he - he - there was no response. He just took off running. Um, I didn't know if he was under the influence of something. But like when I saw the knife in his hand he kind of had it about waist level. And, uh, when he saw me and I told him drop the knife and police, um, he tried to tuck it behind his arm, uh, kind of like to hide it. He took off running up the stairs. I'm thinking like, "What's this guy gonna do? Is he gonna go stab somebody? Is he trying to kill somebody?" Um, I had no clue, uh, if he - he was there to kill somebody. So I holstered my gun. I take off running, uh, up the stairs after him. I kind of stumbled, uh, in the stairs as I was putting my gun away.  Um, I think I missed the first step and kind of went down a little bit.  I caught myself and took off running. We got to, uh - well, I got to the top of the stairs. I lost - lost sight of him once he took

off, uh, up the stairs and I stumbled. I got to the stop - the top of the stairs. And the hallway runs left and right. When you go to the left there's a - um, th-this walkway over here to the rooms. It kind of runs like this. I got to the, uh, top of the stairs. Um, I came to...

Q1: I realize it's kind of hard to tell from these pictures. A: But I went to the left. Um, the stairs I think they're more over here maybe. Somewhere over here towards the middle. I think that's where - where they are over here towards this area. And, uh, I got up here. I looked to my left I didn't see him. I looked to my right I didn't see him. Um, and I went to the right. I just picked a direction and went. So I came around and started running this way. I got to about right here maybe. And I seen him, uh, about halfway down the hallway between the beginning of the hall, uh, the walkway and where the landing is to go back down. He was maybe 20' or so, 20 - 20-something feet. Um, when I saw him, um, he was looking at me.  And he had a - a blue bottle. Um, I think there was detergent in his left hand. And he had the knife in his right hand. He squared up on me. I drew my taser and I fired. Um, he took off running. He - and before I fired he actually said something and I can't remember what it was. I didn't understand what he said. Uh, when I was up here I told him, "Drop the knife. Please, drop the knife." And, uh, I- uh, deployed my taser. Uh, it didn't have any effect. I heard him go, "Ooh," like making an "ooh" sound. And, uh, he took off running again.

Q1. Mm-hm.

A: Uh, when he took off running we got to the landing on the stairwell for the second floor. He went down. Um, I came around the corner and I kind of slowed down 'cause I didn't wanna get ambushed.  And, uh, I'm like, okay. Uh, is this guy going back here to the guy that's on the grass? Uh, did they get into it earlier or something? Is he gonna try to stab him? There was a gentleman that was here in one of these parking spots, uh, when I came through earlier. And he was cleaning his rims. He was an African-American gentleman, he was cleaning his rims, uh, when I came through. And I was thinking - I was like, well, if he goes this way that gentleman that was walking the dog that flagged me down he's there, is he gonna stab him? Is he gonna come back down to this guy over here that - and try to stab him, kill him? Um, I didn't know if they had gotten into it. I couldn't tell if he was intoxicated. Um, if he was drunk, high.  And, uh, I - I was fearing for their lives. I remember hearing traffic on the radio, too, where they were - started sending units, uh, more officers my way. Uh, 'cause I called out on pursuit, like on foot pursuit. And I don't think I said foot pursuit. I think I said that he was running. Um, and that was when he first took off running from me at the bottom of the stairs, uh, that I called out that he was running. Um, so I knew there was more officers coming towards me. Uh, and I was scared. If - it was like is this guy gonna hide somewhere and one of the officers is gonna pull up, is he gonna try to stab him as they're gettin' out of their cars? Were t- they're still not on the ground. He got, you know, their vision isn't a hundred percent because of the (APO) or the (B) pillars to the

doors, stuff like that. And is he gonna get in a police car? Is he gonna try - is he gonna try to take a gun? Um, does he have a gun? Um, when, uh, he - he went down the stairs, uh, I came around slow. And he was at the bottom of the stairs. I was up at the top of the stairs. Uh, I deployed my second shot on the - on - on the taser. And, uh, he (stiffed). And he's looking at me, uh, over his right shoulder. I deployed my second, uh, shot on the taser. Um, it had an effect on him. He stiffened up. Um, when he start - he stiffened up, he started to twist and falls down on the ground. At that point I heard - I mean, it was a loud thump. I holstered my, uh, taser up. Uh, run down to him. Um, kind of touch him, was like, "Hey, man, you okay, you okay?" Uh, there was no response. I got on the radio. He, um - got on the radio. Told dispatch that I fired my taser. I - I think I told them that I fired my taser a second time. Um, I told them that he had fallen. Um, and, uh, I think a couple minutes later I might have told them he was bleeding from his ear. Uh, when, um, Officer (Payton) arrived shortly a- after that, um, when he fell and I got down the stairs, though, um, the knife was on the ground. I picked it up and I put it behind my Asp and my flashlight so, uh, no- nobody could get to it. Uh, put it there. Uh, called for EMS. I think I called twice, actually, for EMS. Told them that he was breathing, his eyes were open. Uh, it - it looked like it was more of a forced breathing. Um, he, uh - and he's - he was just laying there on the ground. Um, I'm not sure what Officer (Payton) said when he got there, if he was 1023, if he was on scene. But I knew he had - he just pulled up.  Because - and at the angle I was on I kind of saw, um, his car pull in.  And I stepped out from that walkway. And I yelled at him. I said, "Hey, I'm over here." He runs over there. Um, he asked me, "Hey, you check for any more weapons?" And I said, no, I hadn't. I hadn't patted him down or anything like that. Um, we, uh - and I don't know if I helped him handcuff him or not. Uh, but I know he was handcuffed. Officer (Payton) checked him - checked him for weapons. He didn't find anymore. At that time I think Officer Jacobs pulled up. And, uh, we took the cuffs off and, uh, started bandaging his head.

**The Professional Standards Taught to Officers Regarding the Use of Force (Force Options):**

Officers throughout the nation are trained that a subjects' resistance/actions to an arrest will determine the type of force used by peace officers. The following (as an example) illustrates how a subject's resistance/actions can correlate to the force applied by an officer. (Listed as Subject's Actions, Description of Resistance and Possible Force Option):

*Cooperative* - Subject offers no resistance:

• Mere professional appearance
• Nonverbal actions
• Verbal requests and commands

*Passive non-compliance* - Does not respond to verbal commands but also offers no physical form of resistance:

• Verbal requests and commands
• Officer's strength to take physical control, including lifting/carrying  • Control holds and techniques to direct movement or immobilize a subject

*Active resistance* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling an intention to avoid or prevent being taken into or retained in custody:

• Control holds and techniques to control the subject and situation
• Use of personal weapons in self-defense and to gain advantage over the subject
• Use of devices to secure compliance and ultimately gain control of the situation

*Assaultive* - Aggressive or combative; attempting or threatening to assault the officer or another person:

• Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
• Use of personal body weapons in self-defense and to gain advantage over the subject

*Life-threatening* - Any action likely to result in serious injury or possibly the death of the officer or another person:

- Utilizing firearms or any other available weapon or action in defense of self and others

Officers are also trained that they must take into account the *totality of the circumstances* when selecting a reasonable force option. They are also required to use the force option appropriate for the situation and must continually reevaluate the subject's action and must be prepared to transition as needed to the appropriate force options because conditions may change rapidly during an officer-civilian encounter. Accordingly, an officer's force options are not limited based on any single factor.

In this set of facts, it is uncontested that Officer Cruz had no information about Mr. Roberts other than from a civilian (Mr. Jacob Pinette) who approached Officer Cruz while he was running license plates in the hotel parking lot. Jacob Pinette informed Officer Cruz that a person was in the hallway holding a knife. Officer Cruz had no reports (or even any indication) that Mr. Roberts was threatening, abusive, assaultive or intoxicated.

Officer Cruz was not aware of anyone in the area shouting for help or that there was any indication of a person in distress, or that anyone had called the JPD for a police response to the hotel. Officer Cruz also saw that Mr. Roberts had no physical indications of having been involved in a struggle (such as blood or injury on his person or clothing). Additionally, Officer Cruz knew that pursuant to the Kentucky State Code, it was not a violation of law (as he testified) for Mr. Roberts to have a knife in his possession.

It is also uncontested (as cited above) that when Officer Cruz located and encountered Mr. Roberts, he immediately drew his gun and pointed it at Mr. Roberts and ordered him to "drop the knife." Although Mr. Roberts allegedly did not drop the knife, he (Roberts) did not assault or threaten Officer Cruz but rather simply ran away to avoid contact. Officer Cruz chased after Mr. Roberts, and after shouts to stop, Mr. Roberts did, in fact, stop and turned towards Officer Cruz. When Mr. Roberts stopped, according to Officer Cruz, Mr. Roberts "squared up" but never verbally threatened, or aggressed toward Officer Cruz. Nonetheless, Officer Cruz fired his taser and Mr. Roberts uttered a sound of surprise, "I heard him go, "Ooh," like making an "ooh" sound. And, uh, he took off running again."

According to Officer Cruz, he fired his taser at Mr. Roberts the first time while on the second floor of the hotel and Mr. Roberts immediately turned away and fled down the stairs to the first level. Officer Cruz fired his taser a second time with the two barbs successfully imbedding into Mr. Roberts' back and causing his body to "lock-up." Mr. Roberts fell to the ground causing a catastrophic and fatal injury to his head.

As designed, the taser used by Officer Cruz includes a recorder that documents the timing between the sequence of trigger pulls. According to the taser download Officer Cruz fired a second time within just three seconds. Although Officer Cruz states that he believes Mr. Roberts was no longer on the stairway when he pulled the trigger on his taser, the timing indicates that Mr. Roberts was more likely still on the stairs when he fell. In addition, Jacob Pinette told the police that Mr. Roberts was still halfway up the stairs when he was tased, and EMT B. Girard was told by a police officer at the scene (unidentified) that Mr. Roberts had fallen down four stairs.

Tasers are designed to physically incapacitate a subject to overcome an aggressive and/or combative threat as supported by the totality of circumstances. Additionally, taser training given to all officers is that the taser should never be used against subjects who are in an elevated position because of the expected loss of control and fall that will result. Pursuant to his training, Officer Cruz had an ethical responsibility by policy, training and law to treat Mr. Roberts with an appropriate level of force. In this incident, Mr. Roberts was obviously non-threatening and non-combative and standing on an elevated stairway.

Officers are not justified in any use of force based upon subjective fear. Rather, the controlled and legitimate fear or mechanism that is necessary for officer safety must be based on actual perceived circumstances

Unreasonable Fear is defined as: *Generated in the officers' mind with no direct correlation to facts and situations*. As stated above, officers are taught that any use of force must be based on an *objective* rather than a *subjective reasonable necessity of action to counter imminent danger*.

In this case, Officer Cruz fired his taser at a man who was running away and descending a concrete stairwell. Officer Cruz's decision to fire a taser at a man running down a steep concrete staircase became a type of lethal force, and his use of this level of force violated logic, reason, the law, specific taser training and policy.


**Opinions Thus Far:**

Officers and investigators are trained that any honest evaluation of a use of force incident must be based on what the officer knew at the time and not on the basis of "20-20 hindsight." Accordingly, the following opinions are expressed in the context of what Officer Cruz knew at the time that he fired his taser at Mr. Roberts and caused him to fall and hit his head at the bottom of the stairway and not what was developed subsequent to his death - specifically, that Officer Cruz had no knowledge whatsoever that Mr. Roberts had an outstanding warrant for his arrest or that he had been threatening to any guest of the hotel (as detailed above). My opinions are stated with these facts in mind.

1. Based upon the information Officer Cruz knew at the time, and during the initial encounter, he (Cruz) had no basis (probable cause) whatsoever to arrest Mr. Roberts. Nonetheless I am not critical of Officer Cruz responding to the hotel to locate Mr. Roberts pursuant to the report given to him by Mr. Pinette. However, Mr. Pinette's report was that no crime was in progress and was simply in the category of "suspicious circumstances." Officer Cruz would know per his training such reports are very often resolved with no criminal conduct in progress. In this case Officer Cruz' authorized use of force was limited to a temporary detention of Roberts. In the training the term is, "Reasonable Suspicion Detention." As such Officer Cruz' right to use force on Mr. Roberts during his initial encounter was more restrictive than his lawful right to use force for an arrest based upon "probable Cause." The use of lethal force is not justified to overcome resistance to a reasonable suspicion detention.

2. Officer Cruz says his actions were justified because Mr. Roberts was holding a knife. Holding or carrying a knife is not a criminal act. Any number of common household items and tools can be used as weapon. The question is what is the subject doing with them. In this case, there is no evidence that Mr. Roberts had threatened or assaulted anyone with the knife, and Officer Cruz's claim that he tased Mr. Roberts because Officer Cruz was afraid Mr. Roberts would do so is baseless speculation unsupported by any facts, and could be used to justify the use of lethal force against any citizen who happens to be holding something that could be used as a weapon.

3. It is uncontested in the record that Mr. Roberts never, at any time aggressed at Officer Cruz. The use of a taser is a very extreme use of force and, per policy and training, can result in death if used improperly. Accordingly, training and policy is that the taser is used against an active aggressive or combative threat. Additionally, Taser itself requires training that it should not be used against subjects who are in an elevated position because of the catastrophic fall that will result when the subject "locks up."

4. Taking Officer Cruz's set of facts as true - that he fired his taser after Mr. Roberts turned, ran away, and was descending or had descended a narrow, steep, concrete stairwell, then Officer Cruz deliberately fired his taser knowing that Mr. Roberts might "lock up" and fall without any ability to brace himself or prevent a forceful blow to his head as it struck the cement at the bottom of the stairs. Officer Cruz has testified that he has been trained on the proper use of a taser, and would have known that Mr. Roberts would have lost

control of his body on concrete, and would have fallen and seriously injured himself or worse, which occurred in this case. Officer Cruz has testified that he tried not to tase Mr. Roberts while he was on the stairs because he knew that could cause serious injury. Therefore, there is no justification for using the Taser against Mr. Roberts while he was descending the stairs, which would have amounted to a use of deadly force. Even if Officer Cruz did not fire his Taser until Mr. Roberts was off the stairs, his use of the Taser was still unnecessary, excessive, and unreasonably dangerous. Because of the injuries that can occur if a Taser is used against a subject while they are running away, where their momentum might exacerbate their injuries if they fall, officers are trained not to use a Taser against fleeing subjects except in limited circumstances, none of which were present here.

5. Officer Cruz cannot seriously believe that, as he claimed in his deposition, the circumstances of this case justified the use of lethal force. If he seriously believes that, then serious remedial training should be required for him to remain a police officer.

6. Jacob Pinette was the witness who flagged down Officer Cruz and told him he'd observed Mr. Roberts holding a knife. Mr. Pinette says that he observed Officer Cruz fire his taser into Mr. Roberts' back while Mr. Roberts was on the "5th or 6th step".

> Q: All right, what happened after that?
> A: Well from the - the 5th or 6th step, that's when the guy
>     landed head first.
> Q: Okay.
> A: On the concrete, and I heard a big bang.
> Q: Okay.
> A: From there.
> Q: All right. Um, what floor were they on? Were they
>     on...
> A: They were on...
> Q: ...were they on the 3rd floor?
> A: ...the 2nd floor.
> Q: Second floor?
> A: And that's when, uh, the officer told him, "Don't run,
>     don't run," and...
> Q: Okay.
> A: ...he tased him. (Pinette Interview, Pages 4-5)

I can conceive of no reason Mr. Pinette would lie about this.

Page 21 of 30

5.  EMT B. Girard recorded in his EMS run sheet that Mr. Roberts "fell down approx. four (4) stairs."  He later said in his police interview that he was told that by an officer at the scene, but he could not remember who.  EMT Girard is employed by Jeffersontown Fire and EMS, a companion agency to the JPD.  I can conceive of no circumstances in which EMT Girard would make this up.  Likewise, I cannot imagine a scenario in which a police officer would make such a representation to EMT Girard unless he believed it was factual and might assist in the diagnosis and treatment of Mr. Roberts' injury.

6.  Across the country police departments for decades have recognized and trained their officers in safe and accepted ways to pursue, contain and arrest subjects in order to avoid deaths and excessive force, such as the one that occurred in this case. These methods are well known and proven effective for the safety and welfare of both officers and the public. Jeffersontown Police Department Officer Cruz appears to have used none of these, and there is no evidence that he was ever adequately trained in these methods, or, since this incident, retrained. There is nothing reflecting any new training or policies in any of the materials produced in this case. Without such, it is only a matter of time before additional tragic and unnecessary deaths occur again.

**Information Regarding the Taser Weapon:**

The taser is classified as an Electronic Control Weapon (ECW) [originally called Conducted Energy Device - CED], and is a unique use-of-force tool typically used by law enforcement officers to overcome a suspect's assaultive/combative behavior and/or resistance to arrest. The most common ECWs (and which was used by Officer Cruz) in use throughout the nation are manufactured by Taser International.

The Taser was designed to discharge electrical charges into a subject to create involuntary muscle contractions that override the suspect's voluntary motor responses. The taser has three modes of use: "probe," "touch-stun," and "elongated stun" modes. Projectiles with wires are contained in an ECW cartridge. When fired in the probe mode, a cartridge projects, through a set of wires, a pair of barbs (or darts with hooks) that attach to clothing or penetrate the skin after the Taser is fired, delivering an electrical charge. As the barbs penetrate, the electrical current is sent down the wires and through the body between the two barb points. The application of the electrical energy painfully influences and incapacitates the subjects' muscles and nerves.

The effect of the taser on a suspect through the application of an electrical pulse is called "neuromuscular incapacitation" (NMI). The NMI pulse provides electrical energy that provides the officer the ability to dominate a suspect's motor nervous system by interfering with electrical signals sent to the skeletal muscles by the central nervous system. Since the incapacitation is proportional to the muscle mass captured by the NMI, the amount of distance between the two probes when they embed is directly proportional to the effectiveness of the NMI. It must be also noted that the infliction of pain occurs regardless of

the distance between the two probes. Thus, despite the distance between the embedded probes (and NMI result), significant pain is inflicted regardless of the existence or absence of NMI. As previously noted, tasers are designed to discharge for 5 seconds when the trigger is pulled. The weapon will shut off automatically unless the officer keeps the trigger depressed. The weapon records each pull of the trigger and the record can be downloaded for investigative purposes. In this case it is uncontested that the time between Officer Cruz' first trigger pull (on the second floor) and his second trigger pull (at the stairway) was only three seconds.

## My Qualifications To Review This Case:

My opinions are based in part on my training, professional experience and education. I am a 27-year veteran of the Los Angeles County Sheriff's Department (LASD).  I was hired on December 1, 1965, and I retired from active service on March 31, 1993.  My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18-month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units.  I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

Page 23 of 30

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later.  During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for

our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1900 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested. Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at

the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."

On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons. I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion). My opinions supported argument in the Ninth Circuit case: *Chaudhry v.*

*City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.*, Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322, *Carey Woodcock v. City of Bowling Green, et al*, Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al*, Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit

opinion, Case No. 16- 15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit.  My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego*, 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity.  My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer*, Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force. I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.*, Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al*, D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.*, Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness. My opinions (and quoted by name) supported argument in the Ninth Circuit case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and  *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding in-custody suicidal prisoners and qualified immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.*, D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016. I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that included requested training opinions. I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al*, USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al*, USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv 00236 BAS-NLS. There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct. Executed September 18, 2020 at Santee, CA.

Roger A. Clark