UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CYNTHIA HEFFNER ROBERTS, ET AL.,                              Plaintiff

v.                                          Civil Action No. 3:19-cv-00186-RGJ

MANUEL CRUZ                                                   Defendant

* * * * *

**MEMORANDUM OPINION & ORDER**

Defendant Officer Manuel Cruz moves for summary judgment.  [DE 66-1 ("Mot. for Summ. J.")].  Cynthia Heffner Roberts, Administratrix of the Estate of Christopher Allen Roberts, Deceased, and Next Friend of A.A.R., Mr. Roberts' Minor Daughter (collectively "Plaintiffs"), responded.  [DE 77 ("Resp.")].  Officer Cruz replied.  [DE 87 ("Reply")].  This matter is ripe.  For the reasons below, the Court **GRANTS** Officer Cruz's motion for summary judgment [DE 66-1].

## I.      BACKGROUND

Christopher Allen Roberts died as a result of injuries sustained from a foot pursuit that ended in Officer Cruz's use of a taser.  Because Roberts died and no other witness has testified about the incident, the Court starts with Officer Cruz's statement of the relevant facts and then sets out Plaintiffs' objections.

On July 19, 2018, Jeffersontown Police Officer Cruz, was on patrol at Hometown Studios, a three-story hotel, [DE 66-3 at Page ID 698 ("Cruz Transcript")]; *see also* [DE 66-5 ("Hometown Photographs")], when he was "flagged [] down" by Jacob Pinette.[1]  [DE 66-3 at Page ID 698 ("Cruz Transcript")]; *see also* [DE 66-1 at 2 ("Mot. for Summ. J.")]; [DE 77-4 at Page ID 2892 ("Administrative Incident Report")].  Pinette told him that there was a man walking around the

---

[1] Pinette has given no testimony and neither party has been able to locate him.  [DE 66-1 at Page ID 669 n.2 ("Mot. for Summ. J.")]; *see also* [DE 77 at Page ID 2833 ("Resp.")].

area carrying a "big knife." *Ibid.* Upon receiving this information, Officer Cruz performed a sweep of the area and the first floor of the hotel. *Ibid.* Because Officer Cruz "never saw anybody" with a knife, he returned to Pinette in order to obtain a physical description of the man carrying the knife. *Ibid.* Pinette described the man as "a white guy" wearing a "white t-shirt" and "red shorts." [DE 66-3 at Page ID 701 ("Cruz Transcript")]; *see also* [DE 66-1 at 2 ("Mot. for Summ. J.")]; [DE 77-4 at Page ID 2892 ("Administrative Incident Report")]. Officer Cruz radioed in what Pinette had told him and then resumed his search. *Ibid.*

As Officer Cruz searched the first floor, he encountered Christopher Allen Roberts, who matched Pinette's description of the person carrying the knife. *Ibid.* Officer Cruz asserts that Roberts had what appeared to be a "black buck knife" in his right hand. [DE 66-6 at Page ID 788 ("Cruz Dep.")]. When the two men "came face to face," Officer Cruz tried to start a dialogue, but Roberts "turned" the knife "towards" Officer Cruz. [DE 66-6 at Page ID 783, 788 ("Cruz Dep.")]; *see also* [DE 66-1 at 2 ("Mot. for Summ. J.")]; [DE 77-4 at Page ID 2892 ("Administrative Incident Report")]. Officer Cruz asserts that from a distance of about four feet, Roberts "[r]aised his right arm with the knife in his hand and pointed it at" Officer Cruz. [DE 66-6 at Page ID 784–86 ("Cruz Dep.")]. Officer Cruz drew his firearm, backed away, and instructed Roberts to "Stop. Drop the knife." [DE 66-3 at Page ID 701 ("Cruz Transcript")]; [DE 66-6 at Page ID 783 ("Cruz Dep.")]; *see also* [DE 66-1 at 2 ("Mot. for Summ. J.")]. Officer Cruz observed that Roberts' pupils were dilated and that "he had a blank stare on his face," suggesting that Roberts might be intoxicated. [DE 66-3 at Page ID 701 ("Cruz Transcript")]; [DE 66-6 at Page ID 791–92 ("Cruz Dep.")]; *see also* [DE 66-1 at 3 ("Mot. for Summ. J.")]. Officer Cruz testified in his deposition that all he could think of at that time was: "What's this guy gonna do? Is he gonna go stab somebody? Is he trying to kill somebody?" [DE 66-3 at Page ID 701 ("Cruz Transcript")].

According to Officer Cruz, Roberts neither stopped nor dropped the knife; instead, Roberts "cupped [the knife] behind his arm" and "took off running" up the stairs.[2]  [DE 66-6 at Page ID 785, 789 ("Cruz Dep.")]; *see also* [DE 66-3 at Page ID 701 ("Cruz Transcript")]; [DE 77-4 at Page ID 2892 ("Administrative Incident Report")].   Officer Cruz holstered his weapon and chased Roberts.  *Ibid.*  As the pursuit began, Officer Cruz made a radio call to alert other officers that he was in foot pursuit.  *Ibid.*  Once at the top of the stairs, Officer Cruz claims that he unholstered his weapon and turned to the right.  [DE 66-6 at Page ID 797–98 ("Cruz Dep.")].  He then testified that he observed Roberts pushing down on the handles of hotel doors, trying to enter multiple rooms.  [DE 66-6 at Page ID 765, 796, 839 ("Cruz Dep.")].  From a distance of about twenty to twenty-five feet away, Roberts then turned and "squared up" to Officer Cruz.  [DE 66-6 at Page ID 795 ("Cruz Dep.")]; *see also* [DE 66-3 at Page ID 701–02 ("Cruz Transcript")].  Officer Cruz asserts that Roberts was still holding the knife in his right hand and had a blue bottle of detergent in left hand.  *Ibid.*  Officer Cruz alleges that, because of his distance from Roberts, he "felt comfortable deescalating the situation and holstering [his] handgun and changing to a taser."  [DE 66-6 at Page ID 798 ("Cruz Dep.")].  Officer Cruz warned Roberts, "Stop.  Drop the knife.  I'm going to tase you."  *Ibid.*  Officer Cruz then repeated, "Stop.  Drop the knife."  *Ibid.*  Roberts refused to obey those commands.  *Ibid.*  Officer Cruz deployed his taser, but the shot missed.  *Ibid.*

Officer Cruz alleges that Roberts then "took off running again," rounding a corner and heading down a stairwell to the parking lot.  [DE 66-6 at Page ID 751–53 ("Cruz Dep.")]; *see also* [DE 66-3 at Page ID 702 ("Cruz Transcript")]; [DE 77-4 at Page ID 2892 ("Administrative

---

[2] Although unknown to Officer Cruz at the time of this encounter, on July 19, 2018, there was an active warrant for Robert's arrest.  [DE 66-1 at Page ID 672 ("Mot. for Summ. J.")]; *see also* [DE 77 at Page ID 2844 ("Resp.")].  Roberts had been ordered to remain on home incarceration for pending DUI charges, but on June 28, 2018, Roberts cut the band off his GPS monitor, resulting in the issuance of an arrest warrant.  *Ibid.*

Incident Report")].  Fearing an ambush, Officer Cruz testified that he slowly rounded the corner and approached the stairs.  *Ibid.*  He testified that he could hear from his radio and nearby sirens that other officers were about to arrive on scene.  *Ibid.*

Officer Cruz testified at his deposition that he saw Roberts at the bottom of the stairs, with at least one foot, maybe both feet, on the landing.  [DE 66-6 at Page ID 751–53 ("Cruz Dep.")].  He testified that he was thinking about all the people who Roberts might harm, Pinette, an officer arriving for backup, or another citizen.  Cruz testified that a man had been cleaning the rims of his car in the parking lot.  [DE 66-3 at Page ID 702 ("Cruz Transcript")]; *see also* [DE 66-6 at Page ID 768–73 ("Cruz Dep.")].  Officer Cruz testified that Roberts was looking back over his shoulder and continuing to run away with the knife in his hand.  *Ibid.*  Officer Cruz states that he determined that Roberts was no longer on the stairs and that it was safe to deploy his taser.  *Ibid.*  So, with Roberts about twelve to fifteen feet away, Officer Cruz fired his taser a second time.  *Ibid.*  This time, the taser struck Roberts in the back.  *Ibid.*  Officer Cruz states that he saw Roberts "twist" and "fall[] down," at which point Officer Cruz heard a "loud thump."  *Ibid.*

Officer Cruz then holstered his taser and ran down the stairs to Roberts, who was lying on the ground.  [DE 66-3 at Page ID 702–03 ("Cruz Transcript")]; *see also* [DE 66-6 at Page ID 802–05 ("Cruz Dep.")]; [DE 77-4 at Page ID 2892 ("Administrative Incident Report")].  Officer Cruz testified that the knife was laying on the ground next to Roberts' hands.  *Ibid.*  To make sure that "nobody could get to [the knife]," Officer Cruz picked up the knife and tucked it in his gun belt. *Ibid.*  Officer Cruz touched Roberts and asked if he was okay, but Roberts did not respond.  *Ibid.* Officer Cruz then made two calls for Emergency Medical Services, and, with help from his backup partner who had just arrived, handcuffed and searched Roberts.  *Ibid.*  Once Officer Cruz and his partner had searched Roberts, they removed the handcuffs and began providing first aid.  *Ibid.*

Roberts died the next day from a closed head injury sustained when he fell after being tased by Officer Cruz.  [DE 77-6 ("Final Diagnosis")].  Postmortem testing revealed that Roberts tested positive for methamphetamine and fentanyl.  *See id.*

Plaintiffs dispute much of Officer Cruz's version of events, even suggesting that Officer Cruz fabricated his story, however, Plaintiffs witnessed none of the events at issue and provide no eye witness accounts to contradict Officer Cruz.  [DE 77 at Page ID 2834, 2837–38 ("Resp.")]. As an initial matter, Plaintiffs repeatedly claim that Roberts' knife remained in a black sheath throughout the entire incident.  *See id.* at 2834, 2844–46.  Although Officer Cruz agrees with Plaintiffs on this point, Officer Cruz testified that he thought Roberts was holding an unsheathed black buck knife and did not realize until after the incident that Roberts had actually been holding a fixed blade knife in a black sheath.  [DE 66-1 at 2 ("Mot. for Summ. J.")].  Plaintiffs challenge Officer Cruz's assertion that he never noticed the sheath citing deposition testimony from an investigating officer that Pinette saw the sheath from twenty to forty feet away.  [DE 77 at Page ID 2834, 2847 ("Resp.")].  Plaintiffs then assert that Officer Cruz must have seen the sheath when he was only four feet from Roberts.  *Id.*

Furthermore, Plaintiffs assert that Roberts never threatened Officer Cruz or anyone else with the knife.  *See id.*  In support of this claim, Plaintiffs cite deposition testimony where Officer Cruz states that he never heard or saw Roberts threaten Pinette or another citizen with the knife. [DE 77 at Page ID 2834, 2837 ("Resp.")]; *see also* [DE 66-6 at Page ID 771 ("Cruz Dep.")].  And Plaintiffs dismiss the allegation that Roberts pointed the knife at Officer Cruz, noting without support that Roberts did not orally threaten Officer Cruz.  [DE 77 at Page ID 2843 ("Resp.")]; *see also* [DE 66-6 at Page ID 780 ("Cruz Dep.")].  Plaintiffs also claim that in Officer Cruz's July 25, 2018, interview, which occurred only six days after the incident but two years before his

5

deposition, Officer Cruz said nothing about Roberts pointing the knife at Officer Cruz. Rather, Officer Cruz only told investigators that Roberts "kind of had [the knife] about waist level," and, upon seeing Officer Cruz and receiving orders to drop the knife, Roberts "tried to tuck [the knife] behind his arm . . . to hide it" and then "took off running up the stairs." [DE 66-3 at Page ID 701 ("Cruz Transcript")]. Although this language from the initial interview suggests to Plaintiffs that Roberts did not point the knife at Officer Cruz it is not so inconsistent that it completely contradicts Officer Cruz's deposition testimony that Roberts did in fact point the knife at Officer Cruz or make it impossible for both recitations of the events to be truthful. [DE 77 ("Resp.")].

Plaintiffs also assert that Roberts was not holding the knife in his hand when he was tased. Plaintiffs speculate that the knife might have been in Roberts' pocket at the moment Officer Cruz tased him, or, alternatively, maybe Roberts had dropped the knife before reaching the stairs. [DE 77 at Page ID 2845–46 ("Resp.")]. To support this hypothesis, Plaintiffs first cite the deposition testimony of Sargent Graas, one of the detectives who investigated the scene. [DE 73-3 at Page ID 2607–08 ("Graas Dep.")]. According to deposition testimony, Pinette advised Sargent Graas that Roberts was trying to "jump" down the steps, meaning that Roberts was putting both hands on the railing and attempting to use that momentum to swing his feet down and "bound" over several steps. *Id.* Plaintiffs assert that Roberts could not have been holding a knife while grasping the railing. [DE 77 at Page ID 2845–46 ("Resp.")]. Plaintiffs next point to the two cell phones that were found in Roberts' possession. *Id.* Plaintiffs speculate that the serious damage to one of the phones, but not the other, along with the distance between where the two phones landed, suggests that one of the phones, but not the other, was in Roberts' pocket when he fell. *Id.* Plaintiffs contend that Roberts might have been holding a phone in one hand and laundry detergent in the other hand, meaning that it would have been impossible for Roberts to also be holding the

6

knife. *Id.* Finally, Plaintiffs claim that the knife fell out of Officer Cruz's belt when he was doing a walk-through of the scene, a fact which, to Plaintiffs, indicates that Roberts could also have dropped the knife. *Id.*

Similarly, Plaintiffs "vigorously dispute[]" Officer Cruz's statement that Roberts attempted to enter multiple hotel rooms while armed with a knife. *Id.* at 2845. Plaintiffs ask how Roberts could attempt to open a door while holding a laundry bottle in one hand and a knife in the other. [DE 77 at Page ID 2844 ("Resp.")]. To this, Officer Cruz explains that "[t]he handles of the hotel doors were simple push down handles, which could easily be opened with a hand that is grasping an object like a knife." [DE 87 at Page ID 2947 ("Reply")].

Plaintiffs dispute Officer Cruz's statement that he waited until Roberts was on the landing to fire his taser. According to Plaintiffs, "substantial evidence" shows that Roberts was "four to six steps *up* the staircase when he was tased." *Id.* at Page ID 2839. Plaintiffs provide deposition testimony of Sargent Graas indicating that Pinette might have witnessed Roberts being tased either four steps or halfway up the staircase. [DE 73-3 at Page ID 2605–07 ("Graas Dep.")]. Plaintiffs provide Roberts' patient care record, which states that Roberts fell four feet on stairs. [DE 66-15 at Page ID 1219 ("Run Report")]. Based on this description of Roberts' injury, Plaintiffs believe that an unidentified officer told the emergency medical technicians at the scene that Roberts had been four steps from the bottom when he was tased. [DE 77 at Page ID 2839 ("Resp.")]. Plaintiffs also assert that Officer Cruz estimated that he was about twelve feet away from Roberts when he pulled the trigger on the taser, which, to Plaintiffs, would have placed Roberts on or around the fourth step when he was tased. *Id.* Plaintiffs also cite the coroner's final diagnosis, which describes Robert's cause of death as "a closed head injury sustained in a fall down stairs." [DE

77-6 ("Final Diagnosis")].  And finally, Plaintiffs claim that expert forensic evidence suggests that Roberts was probably on the stairs when he was tased.  [DE 77 at Page ID 2839 ("Resp.")].

## II.    STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion.  *Id.* at 252.

The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party.  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).  But the nonmoving party must do more than show some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Liberty Lobby*, 477 U.S. at 252.

Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When "the officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly force case must be decided with particular care." *Burnette v. Gee*, 137 Fed. App'x 806, 809 (6th Cir. 2005) (citing *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994) ). In such cases, "a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial." *Plakas*, 19 F.3d at 1147; *see also Flythe v. District of Columbia*, 791 F.3d 13, 19 (D.C. Cir. 2015) (courts must "carefully examine all evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts").

## III.   ANALYSIS

### A.   *Establishing Which Facts Are Undisputed for Summary Judgment Purposes*

Courts may not resolve credibility disputes on summary judgment. *Liberty Lobby*, 477 U.S. at 255. However, "[t]his rule of procedure typically applies where there is a *genuine* conflict in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2726, at 447 (3d ed. 1998)). This means that the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Grp. Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him

to judgment, or refute the proof of the moving party in some material portion, and . . . may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353–54; *see also Amini v. Oberlin Coll.*, 440 F.3d 350, 357 (6th Cir. 2006) ("Once the moving party has made that showing, the nonmoving party cannot rest on his pleadings but must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial.").

It is therefore necessary to establish where in the record there is truly conflicting evidence, and where Plaintiffs simply rely on credibility determinations. Only then can the Court properly view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party.

Of the facts that are disputed, there are only two where evidence supports the conclusions that Plaintiffs seek to draw. One is where Roberts was standing at the moment he was tased. Plaintiffs have provided testimony, medical records, and forensic evidence that show Roberts might have been four to six steps from the landing when he was tased. [DE 77 at Page ID 2839 ("Resp.")]. Officer Cruz, the lone eyewitness available to testify, says otherwise. [DE 66-1 ("Mot. for Summ. J.")]. The other dispute is whether Roberts was holding the knife when he was tased. Plaintiffs have presented evidence that Pinette saw Roberts grasping the railing with both hands, which makes it at least somewhat less likely that Roberts was holding the knife when he was tased. [DE 77 at Page ID 2845–46 ("Resp.")]. Again, Officer Cruz says otherwise. [DE 66-1 ("Mot. for Summ. J.")]. These are genuine factual disputes that would be inappropriate to resolve at the summary judgment stage. The Court therefore proceeds with its analysis assuming that Roberts was four to six steps from the landing and was not holding the knife when the taser probes made contact with his back.

Plaintiffs' basis for disputing the other aspects of Officer Cruz's version of events "is the product of speculation—not of reasonably drawn inferences." *Wolfanger v. Laurel Cty., Ky.*, No. 6:06-358, 2008 WL 169804, at *7 (E.D. Ky. Jan. 17, 2008).  Sure, there might be some "metaphysical doubt" that Officer Cruz is misremembering or lying about the events on July 19, 2018.  *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586.  But, as previously noted, Plaintiffs have not presented any direct or circumstantial evidence that contradicts the rest of Officer Cruz's story.  Accordingly, the Court presumes for summary judgment purposes that Roberts did attempt to enter multiple hotel rooms and that Roberts was in possession of the knife when he was tased (even if he wasn't necessarily holding the knife at that moment).

### B.  Section 1983

Plaintiffs bring a claim against Officer Cruz for violating Roberts' Fourth and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983.  [DE 1-1 "Compl." ¶¶ 12–14].  "[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation omitted).  To state a claim under Section 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013).

Officer Cruz maintains that Roberts was not deprived of a constitutional right and asserts the affirmative defense of qualified immunity.  "Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).  It "provides ample protection to

all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Thus, law enforcement's conduct is not actionable if they are exercising discretion and their determinations are reasonable. *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993).

When advanced by a defendant, qualified immunity is a threshold question of law appropriately determined on a motion for summary judgment. *Harlow v. Fitzgerald*, 457 U.S. 800 (1983). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ). Once a defendant raises the defense, the plaintiff bears the burden of showing that it does not apply. *Johnson v Moseley*, 790 F.3d 649 (6th Cir. 2015).

The Supreme Court requires courts to follow a two-pronged approach when resolving questions of qualified immunity. First, a court must decide whether a plaintiff has presented sufficient facts that violation of a constitutional right has occurred. *Pearson*, 555 U.S. at 232. Second, a court must decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* Thus, qualified immunity applies unless the official's conduct violates a clearly established constitutional right. *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ). Courts have discretion to decide the order in which to engage these two prongs "in light of the circumstances in the particular case at hand." *Id.* at 236.

     1)  <u>Violation of a Constitutional Right</u>

The Supreme Court has held that claims brought under § 1983 involving law enforcement's use of deadly force are properly analyzed under the Fourth Amendment, which guarantees citizens

the right to be secure in their persons against unreasonable seizures.[3] *Graham*, 490 U.S. at 394. The "reasonableness" of a particular seizure depends on both when it is made and how it is carried out.[4] *Id.* at 395 (citing *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985) ). It is clear that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. "Therefore, only in rare instances may an officer seize a suspect by use of deadly force." *Whitlow v. City of Louisville*, 39 F. App'x 297, 303 (6th Cir. 2002) (citing Garner, 471 U.S. at 9).

The Fourth Amendment's reasonableness test "is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Thus, its application requires careful attention to the facts of each case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*; *see also Smith v. Freland*,

---

[3] Plaintiffs also bring a Fourteenth Amendment claim. However, "[w]here a particular constitutional amendment governs government behavior, . . . claims under § 1983 should be evaluated under that particular constitutional provision, rather than under the Fourteenth Amendment's substantive-due-process rubric." *Wooley v. Robey*, No. 3:21-CV-546-BJB, 2022 WL 526490, at *5 (W.D. Ky. Feb. 22, 2022) (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994) ). As stated above, the alleged violations of Roberts' liberty fall within the Fourth Amendment. Consideration of these claims under the rubric of substantive due process is therefore inappropriate. Accordingly, the Court treats the alleged violations of multiple constitutional rights as one Fourth Amendment claim.

[4] The parties argue about whether Officer Cruz used deadly force against Roberts. [DE 77 at Page ID 2840 ("Resp.")] ("The use of a taser in the circumstances of this case was clearly a use of deadly force, and should therefore be governed by the law of the federal courts on when the use of deadly force is appropriate and when it is not."); *see also* [DE 87 ("Reply")] ("The Plaintiffs attempt to erect a straw man by making a conclusory statement that this case has to be evaluated under the construct of 'deadly force.' "). Yet the proper inquiry is not whether Officer Cruz used deadly force, but whether Officer Cruz acted reasonably. In *Tennessee v. Garner*, 471 U.S. 1 (1985), the Supreme Court addressed the use of deadly force. The Supreme Court later clarified: "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' " *Scott v. Harris*, 550 U.S. 372, 382 (2007). Rather, "*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation." *Id.* (internal citation omitted). Thus, "all that matters is whether [Officer Cruz's] actions were reasonable." *Id.*

954 F.2d 343, 347 (6th Cir. 1992) (noting that courts "must avoid substituting [their] personal notions of proper police procedure for the instantaneous decision of the officer at the scene . . . [and] never allow the theoretical, sanitized world of their imagination to replace the dangerous and complex world that policemen face every day.").

When analyzing excessive force claims, the Sixth Circuit has adopted the view of doing so in segments. *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (holding that review of excessive force claims should be limited to officers' actions in the moments preceding the shooting). This "somewhat narrow interpretation of the Supreme Court's mandate that courts look to the totality of the circumstances in determining if excessive force was used," *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001), is "long-standing practice" in the Sixth Circuit, even though it may lead to more excessive force cases being decided on summary judgment. *Rucinski v. Cty. of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016).

In this case, then, the relevant inquiry is whether Officer Cruz acted reasonably during his final encounter with Roberts. The undisputed facts show that during the final encounter Officer Cruz observed Roberts attempting to enter multiple hotel rooms while holding what looked like an unsheathed black buck knife. [DE 66-6 at Page ID 765, 796, 839 ("Cruz Dep.")]. Officer Cruz thought that Roberts looked intoxicated and asked Roberts to put down the knife, warning him that failure to comply would result in use of a taser. [DE 66-6 at Page ID 798 ("Cruz Dep.")]. Roberts refused to drop the knife and instead ran away in a direction where Officer Cruz knew there to be bystanders. [DE 66-3 at Page ID 701 ("Cruz Transcript")]; [DE 66-6 at Page ID 785, 789 ("Cruz Dep.")] Roberts was seconds away from a parking lot, a place where citizens might quickly approach or step out of their vehicles. [DE 66-3 at Page ID 702 ("Cruz Transcript")]; [DE 66-6 at Page ID 768–73 ("Cruz Dep.")]. Officer Cruz thought that he still saw the knife in Roberts' hand.

[DE 66-3 at Page ID 702 ("Cruz Transcript")]; [DE 66-6 at Page ID 751–53 ("Cruz Dep.")]. Officer Cruz also knew that other officers were about to arrive on scene and believed that Roberts posed a threat to those officers. *Ibid.* In fact, Officer Cruz thought that the other officers' presence might escalate the situation and create an even greater threat for those bystanders. *Ibid.* It was against that immediate backdrop that Officer Cruz fired his taser—not his firearm—while Roberts was four to six steps from the landing. *Ibid.*

Analyzing these facts under the *Graham* factors, Officer Cruz behaved reasonably during this encounter. First, Roberts' crimes were serious. Even though carrying a knife is not itself illegal, Roberts was walking through a hotel, armed with a knife, causing citizens concern, attempting to enter multiple hotel rooms, and ignoring Officer Cruz's orders to drop the knife. [DE 66-3 at Page ID 701–02 ("Cruz Transcript")]; [DE 66-6 at Page ID 783–88, 791–92 ("Cruz Dep.")]. Indeed, Officer Cruz testified that if he had apprehended Roberts, he would likely have charged him with "resisting arrest, fleeing and evading, first degree, attempted burglary, assault third, and . . . probably escaped, because he was on HIP, and . . . he had two warrants for him." [DE 66-6 at Page ID 780–81("Cruz Dep.")]; *see also Reich v. City of Elizabethtown*, No. 3:16-CV-00429-RGJ, 2018 WL 6028719, at *7–8 (W.D. Ky. Nov. 16, 2018), *aff'd sub nom. Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968 (6th Cir. 2019) ("[W]andering around [a] subdivision, acting erratic, standing on a resident's yard armed with a knife, alarming nearby residents, and ignoring [an officer's] commands to drop [a] knife" is serious criminal activity under *Graham* because those actions amount to disorderly conduct, wanton endangerment, trespassing on residents' properties, and resisting arrest.).

Second, Officer Cruz reasonably perceived Roberts as posing an immediate threat to the safety of bystanders and other officers. Officer Cruz thought that Roberts was intoxicated, a

conclusion later confirmed when postmortem tests came back positive for methamphetamine and fentanyl.  [DE 66-3 at Page ID 701 ("Cruz Transcript")]; *see also* [DE 66-6 at Page ID 791–92 ("Cruz Dep.")]; [DE 77-6 ("Final Diagnosis")].  Officer Cruz observed Roberts trying to enter multiple hotel rooms while armed with a knife.  [DE 66-3 at Page ID 701–02 ("Cruz Transcript")]; [DE 66-6 at Page ID 783–88, 791–92 ("Cruz Dep.")].  And when commanded to stop and drop the knife, Roberts did just the opposite, he continued to hold onto the knife and ran away.  *Ibid.*  Roberts then fled in a direction where he was likely to encounter other civilians or police officers. *Ibid.*  Officer Cruz could reasonably perceive from this behavior that Roberts endangered others, including Pinette, the man cleaning the rims of his car, hotel guests, or other police officers.  *See Stevens-Rucker v. City of Columbus, OH*, 739 F. App'x 834, 842–43 (6th Cir. 2018) (finding that an officer behaved reasonably when he shot a fleeing suspect armed with a knife from twenty-five feet away); *see also Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020) ("[O]fficers c[an] use deadly force to stop a person armed with a bladed weapon if they reasonably believe[] the person could kill or seriously injure others.").

Third, Roberts was resisting arrest—or, at a minimum, resisting Officer Cruz's commands to stop and drop the knife.  Thus, the totality of the circumstances justified Officer Cruz's seizure of Roberts, and Officer Cruz's response was reasonable under the circumstances.  *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) ("Ultimately, the court must determine whether the totality of the circumstances justifies a particular sort of seizure.") (citation omitted).

    2)  <u>Clearly Established Right</u>

Even if Plaintiffs had presented sufficient facts that Officer Cruz violated Roberts' rights, Plaintiffs still fail to show that the right at issue was "clearly established" at the time of the incident. As noted above, qualified immunity applies unless the official's conduct violates a clearly

established right. *Pearson*, 555 U.S. at 232. The law must be sufficiently clear that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal citation and quotation marks omitted). Specificity is particularly "important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (per curiam) (internal citation and quotation marks omitted). And lower courts should not read prior decisions too broadly in deciding whether a new set of facts is governed by clearly established law. *Id.* at 1154 (citing City *& Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015) ). "The critical question is whether the case law has put the officer on notice that his conduct is clearly unlawful." *Reichle*, 566 U.S. at 664.

Plaintiffs rely on five cases to show that the law is clearly established for the purposes of qualified immunity: *Smith v. Cupp*; *Sigley v. City of Parma Heights*; *Russo v. City of Cincinnati*; *Sova v. City of Mt. Pleasant*; and *Brandenburg v. Cureton*. [DE 77 at Page ID 2841–42 ("Resp.")]. However, none of these cases clearly establishes a constitutional violation in the context of this case or puts the constitutional question at issue "beyond debate." *al-Kidd*, 563 U.S. at 741.

Although *Smith* and *Sigley* may be somewhat analogous because each case involved a suspect fleeing from police, the Court does not give significant weight to either *Smith* or *Sigley*. Both evaluated the reasonableness of deadly force in the context of a fleeing driver who was not threatening the lives of others. *Smith v. Cupp*, 430 F.3d 766, 768–71 (6th Cir. 2005); *Sigley v. City of Parma Heights*, 437 F.3d 527, 529–31 (6th Cir. 2006). The dangerous "weapon" that the

suspects in *Smith* and *Sigley* possessed was a vehicle. *Ibid.* The knife in Roberts possession is significantly different and does not show that the law was clearly established in the context of qualified immunity.

Plaintiffs' reference to *Russo* fares no better. In *Russo*, a group of officers encountered a diagnosed paranoid schizophrenic man holding a knife in each hand and pointing the blades at the officers. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1039–41 (6th Cir. 1992). One officer fired two taser darts at the man. *Id.* The man overcame the effects of the tasers and rushed toward an officer with both knives pointed toward him. *Id.* Other officers then fired their revolvers, shooting the man twenty-two times. *Id.* Plaintiffs cite *Russo* for the Sixth Circuit holding with regard to the officers' use of their firearms. [DE 77 at Page ID 2842 ("Resp.")]. But here Officer Cruz only used a taser, albeit while Roberts was on a staircase. And in *Russo*, the Sixth Circuit held that it was objectively reasonable for an officer to deploy a taser against a suspect who "was not resisting at the moment, but had been resisting immediately prior, and—but for the use of a taser—was expected to continue resisting in a manner that would have justified the later use of lethal force." *Graves v. Malone*, 810 F. App'x 414, 425 (6th Cir. 2020) (citing *Russo*, 953 F.2d at 1045). The Sixth Circuit concluded in *Russo* that, under such circumstances, the officer who used a taser was entitled to qualified immunity because those actions "were intended to avoid having to resort to lethal force." *Russo*, 953 F.2d at 1045. Nothing in the holding of *Russo* indicates that Officer Cruz's use of a taser had been clearly established as unlawful on July 19, 2018. If anything, *Russo* suggests that Officer Cruz's use of a taser—as opposed to the more lethal option of a firearm—was a reasonable response to the continued threat that Roberts posed to the community.

Plaintiffs also cite *Sova*. In *Sova*, an officer shot a man who was standing in the doorway of his parents' kitchen and holding two butcher knives. *Sova v. City of Mt. Pleasant*, 142 F.3d

898, 900–02 (6th Cir. 1998).  The Sixth Circuit in *Sova* determined that the officer was not entitled to summary judgment because there were "contentious factual disputes," i.e., whether the man had threatened to get a gun and whether, at the time he was shot, the man was charging through the kitchen door or merely standing in the doorway of an empty house.  *Id.* at 903.  Officer Cruz, by contrast, used a taser, not a firearm, to incapacitate a suspect armed with a knife who was fleeing in an area where other civilians and police officers were present.

Finally, *Brandenburg* does not clearly establish that measures similar to those taken by Officer Cruz were unlawful.  In *Brandenburg*, the Sixth Circuit declined to find that an officer was entitled to qualified immunity because there was a question of fact as whether a man pointed a firearm at officers immediately before he was shot.  *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989).  The Sixth Circuit also explained in *Brandenburg* that the reasonableness of the officer's shooting must go to a jury to "consider why" other officers present did not fire "if it was quite obvious that they were being threatened with imminent bodily harm."  *Id.*  Unlike *Brandenburg*, however, this case does not involve an officer's deadly use of a firearm and does not present a question as to why other officers did not use force against Roberts.

Additionally, two similar cases that were not cited by Plaintiffs likewise fail to show that Officer Cruz violated a clearly established right.

The Sixth Circuit case that comes the closest to clearly establishing the right at issue is *Baker v. Union Tp.*, 587 Fed. App'x 229 (2014).[5]  In *Baker*, the Sixth Circuit held that it was objectively unreasonable for an officer to tase a suspect who was standing at the top of a stairwell,

---

[5] Officer Cruz cites an Eighth Circuit case, *McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011), which affirmed qualified immunity for an officer who deployed a taser on a misdemeanant lunging toward a second-story window, even though the use of the taser led to the suspect's death.  [DE 87 at Page ID 2942 ("Reply")].  Although *McKenney* was cited with approval in *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505 (6th Cir. 2012), the Sixth Circuit never fully adopted *McKenney*.  Therefore, *Baker*, a more recent Sixth Circuit opinion, is the better guidepost.

causing the suspect to fall down the stairs and break his neck. *Id.* at 234.  There, the Sixth Circuit

explained that "[i]t is widely known among law enforcement . . . that tasers should not be

employed against suspects on elevated surfaces because of the risk of serious injury from a

resulting fall." *Id.*  However, *Baker* expressed the right at issue as the "right not to be shot with a

taser without warning, while offering no resistance to arrest, and while standing on an observably

elevated surface." *Id.* at 235.  Unlike the suspect in *Baker*, Roberts received a warning before he

was tased; Roberts was fleeing; Roberts could reasonably be perceived as posing a safety threat;

and Roberts was four to six steps from the bottom of a flight of stairs.  [DE 66-6 at Page ID 702,

795 ("Cruz Dep.")]; *see also* [DE 66-3 at Page ID 701–02 ("Cruz Transcript")].  Because none of

those circumstances were present in *Baker*, the right articulated in *Baker* was not defined at a high

enough level of generality to defeat qualified immunity in this case.

     *Peabody v. Perry Twp.,* No. 2:10–cv–1078, 2013 WL 1327026 (S.D. Ohio March 29, 2013)

is similarly inapposite.  In *Peabody*, an Ohio district court determined that a reasonable jury could

find that it was excessive force to tase a suspect while the suspect was climbing over an eight-foot

fence. *Id.* at *5.  However, just as with *Baker*, the suspect in *Peabody* was engaged in behavior

distinguishable from this case.  The suspect in *Peabody* was not armed and did not endanger the

public or the defendant officer; by contrast, Roberts refused to comply with orders to drop his knife

and was running towards an area with citizens and officers. *Id.* at *6; *see also* [DE 66-6 at Page

ID 702, 795 ("Cruz Dep.")]; [DE 66-3 at Page ID 701–02 ("Cruz Transcript")].  The defendant

officer in *Peabody* never warned the suspect that he might be shot with a taser; by contrast, Officer

Cruz told Roberts, "Stop.  Drop the knife.  I'm going to tase you." *Peabody*, 2013 WL 1327026,

at *1–2; *see also* [DE 66-6 at Page ID 7835 ("Cruz Dep.")]; [DE 66-3 at Page ID 701–02 ("Cruz

Transcript")].  The defendant officer in *Peabody* tased the suspect while he was at the top of an

eight-foot fence; by contrast, Officer Cruz tased Roberts while he was four to six steps from the bottom of a staircase. *Ibid.*

Furthermore, this reading of *Baker* and *Peabody* is consistent with precedent holding that it is not excessive force to tase a suspect who is actively resisting arrest or to shoot a suspect who is brandishing a knife. *See, e.g.*, *Sok Kong Tr. for Map Kong*, 960 F.3d at 993 (granting qualified immunity to an officer who shot a man carrying a knife and running across a parking lot, because, even though the man may not have threatened an officer with his knife, he posed a threat to citizens); *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) ("Our cases firmly establish that it is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest."); *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012 ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him."); *Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009) (holding that, where detectives shot and killed a fifteen-year-old boy after he approached them with a knife over his head, the detectives' use of force was reasonable as a matter of law); *Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991) (holding that an officer acted reasonably as a matter of law when he shot and killed a suspect brandishing a knife after the suspect did not comply with commands to drop the knife).

Officer Cruz was confronted with a person holding a knife, attempting to enter multiple hotel rooms, refusing to drop the knife, and fleeing towards a parking lot with bystanders and other officers. Officer Cruz reasonably perceived Roberts as a threat. Even if Officer Cruz was mistaken in his belief that Roberts was a threat, Sixth Circuit law makes clear that "[q]ualified immunity applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact." *Chappell*, 585 F.3d at 907 (citing *Pearson*,

555 U.S. at 231).  Accordingly, it cannot be said Officer Cruz was put on notice that his conduct was unlawful or violated a clearly established right under Sixth Circuit law.

### C.  State Law Battery

Plaintiffs also allege that Officer Cruz committed common law battery upon Roberts.  [DE 1-1 "Compl." ¶ 17].  A battery is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him."  *Richardson v. Bd. of Educ. of Jefferson Cty. Kentucky*, No. 3:04-CV-386R, 2006 WL 2726777, at *11 (W.D. Ky. Sept. 22, 2006) (citing *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000)).  If police action is reasonable under Section 1983, a plaintiff cannot succeed on a common law battery claim.  *Atwell v. Hart Cty., Ky.*, 122 F. App'x 215, 219 (6th Cir. 2005) (citing *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003)).  This Court has already determined that Officer Cruz acted reasonably under the circumstances when seizing Roberts.  For those same reasons, the battery claim must be dismissed.

### D.  Damages

Because Plaintiffs' damages claims for pain and suffering, destruction of power to labor and earn, loss of consortium, and punitive damages, [DE 1-1 "Compl." ¶¶ 1, 18], are derivative of their underlying § 1983 and battery claims, the damages claims are likewise dismissed.

### IV.   CONCLUSION

For all these reasons, and being otherwise sufficiently advised, it is **ORDERED** that Officer Cruz's motion for summary judgment [DE 66-1] is **GRANTED**.

**IT IS FURTHER ORDERED** that Officer Cruz's motions regarding expert testimony, [DE 67], [DE 68], and [DE 69] are **DENIED AS MOOT**.

The Clerk of Court is **DIRECTED** to terminate the motion at DE 66-1 and close the case.

Rebecca Grady Jennings, District Judge

United States District Court

July 21, 2022